## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

SARA CORDRY (01),

     Defendant.

Case No. 18-20033-01-DDC

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Sara Cordry's Motion for Judgment of Acquittal (Doc. 142) and Motion for New Trial (Doc. 163). First, the court grants defendant's Motion for Judgment of Acquittal in part and denies it in part. The court grants defendant's motion on Counts 2-6 of the Indictment. The court denies her motion on Counts 1, 8, and 9 of the Indictment. In other words, the court sustains three of defendant's convictions: Count 1's conspiracy to commit mail and wire fraud and Count 8 and 9's wire fraud. The court acquits defendant on Counts 2-6. Second, although the court concludes that the government presented sufficient evidence to sustain the verdict on Counts 1, 8 and 9, the court grants defendant's Motion for New Trial. The court explains why and addresses defendant's motions, in turn, below.

### I.     Procedural History

On May 9, 2018, a grand jury returned an Indictment charging defendant with one count of conspiracy to commit wire and mail fraud, one count of mail fraud, and seven counts of wire fraud. Doc. 1. Each count also charged violations under 18 U.S.C. § 2, the aiding and abetting statute. *Id.*

To support the conspiracy charge in Count 1, the Indictment alleged the following: defendant and her coconspirators—doing business as Reliant Home Financial Group and The Arize Group, Incorporated ("Arize")—targeted homeowners "who were in financial difficulties with promises that the homeowners . . . would be rescued from their homeowner financial problems." *Id.* at 3.  Specifically, the Indictment alleged, Arize made materially false and fraudulent promises to lower homeowners' mortgage interest rates, lower their monthly mortgage payments, and secure a loan modification for them.  *Id.*  Because Arize instructed victims to pay Arize directly—instead of paying their lending financial institutions—banks purportedly foreclosed on victims' houses.  *Id.* at 5.  This practice caused "financial losses to the lender financial institutions." *Id.* at 5.  The charged conduct occurred between approximately November 2010 and November 2011.  *Id.* at 2.

To support Count 2's mail fraud charge, the Indictment alleged that on May 16, 2011, defendant "placed and caused to be placed in an authorized depository for mail . . . a letter mailed from The Arize Group to Thomas M. . . . with that letter containing a formal offer and demand letter."  *Id.* at 5–6.

Each of Counts 3-9 charged wire fraud and the Indictment alleged that defendant transmitted certain writings in the form of emails in interstate commerce as part of a scheme to defraud.  *Id.* at 6.  The charges in Counts 3-9 relied on the following emails:

| Count | Date | Description of Mailing |
|:-----:|:----:|------------------------|
| 3 | 03/30/2011 | E-mail from The Arize Group to James J. advertising loan audit package. |
| 4 | 04/12/2011 | Welcome E-mail from The Arize Group to James J. requesting financial documents. |
| 5 | 05/10/2011 | E-mail from The Arize Group, Inc. to James J. with attached Formal Offer and Demand Letter. |
| 6 | 05/23/2011 | Email from The Arize Group, Inc. to Mary J.S. with attached Formal Offer and Demand Letter. |

| 7 | 5/18/2011 | E-mail from The Arize Group to Delmar R. requesting financial documents. |
| 8 | 05/18/2011 | Email from The Arize Group to Bruce S. advising client that their documents were sent to The Arize Group "paralegal." |
| 9 | 5/19/2011 | Email from The Arize Group, Inc. to Bruce S. with attached Formal Offer and Demand Letter. |

*Id.* at 6–7.

Trial began on September 17, 2019.  Doc. 133.  After a nine-day trial, the jury convicted

defendant on Counts 1-6 and Counts 8 and 9.[1]  At the close of the government's case, defendant

orally moved for acquittal.  Consistent with Fed. R. Crim. P. 29(b), the court reserved its ruling

and ordered defendant to file a written motion and supporting papers.  Defendant filed her

Motion for Judgment of Acquittal (Doc. 142) on September 26, 2019.  Her motion argues that

the court should acquit her on all counts for two related reasons:  (1) the government failed to

prove beyond a reasonable doubt that the charged offenses affected a financial institution, and

(2) the government failed to prove beyond a reasonable doubt that the charged offenses occurred

within the statute of limitations.  Doc. 142 at 1.

On October 14, 2019, defendant filed a Motion for New Trial (Doc. 163).  Her motion

argues that the court should grant her a new trial because of the "cumulative effect of numerous

discovery violations leading up to trial, the prosecutor's improper closing argument and the

provision of an unsupported aiding and abetting instruction . . . ."  Doc. 163 at 1.

The government filed a Response to defendant's Motion for New Trial (Doc. 166).  But it

didn't file a response to defendant's Motion for Judgment of Acquittal.  So, on December 3,

2019, the court ordered the government to respond.  Doc. 167.  The government filed its

Response (Doc. 168) on December 18, 2019, and defendant filed a Reply (Doc. 172).  In its

---

[1]     The government dismissed Count 7 of the Indictment (wire fraud) at the close of its case.

January 24, 2020 Memorandum and Order, the court identified deficiencies in the government's arguments and the evidence it had cited in its Response to the motion for acquittal. Doc. 173 at 4–12. It also set the motion for oral argument. *Id.* at 12. On January 27, 2020, the government moved to continue the oral argument to permit it time to acquire transcripts from the jury trial. Doc. 175. The court granted the motion and ordered the government to file a supplemental response to defendant's motion. Doc. 177. On March 12, 2020, the government filed its Supplemental Response (Doc. 187), and defendant filed a Supplemental Reply (Doc. 191). Concluding that the parties had provided sufficient briefing for the court to rule the motion, the court canceled oral argument set for May 1, 2020. The court now rules defendant's motions based on the parties' filings. The court first considers the acquittal motion and then, in Part III, addresses the motion for a new trial.

## II.   Motion for Judgment of Acquittal

First, the court sets out Fed. R. Crim. P. 29's legal standard for deciding a motion for judgment of acquittal. Then, it considers whether the statute of limitations bars defendant's convictions, addressing defendant's two related arguments for acquittal.

### A.  Legal Standard under Fed. R. Crim. P. 29(a)

Fed. R. Crim. P. 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Subsection (b) of this rule also authorizes the court to reserve decision on a Rule 29 motion and decide it after the jury returns a verdict. Fed. R. Crim. P. 29(b). But, when the court reserves judgment on such a motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.*

When the court decides a motion for judgment of acquittal, it views the evidence in the light most favorable to the government. *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999). The court must uphold a guilty verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (citation and internal quotation marks omitted). The court considers direct and circumstantial evidence, plus reasonable inferences drawn from that evidence. *United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir. 1993).

### B. Discussion

As explained above, defendant argues that the statute of limitations bars her convictions. Doc. 142 at 1. She asserts that the statute of limitations expired before the government secured an indictment because the government failed to prove something—that her scheme "affected a financial institution"—essential to the government's position that the 10-year statute of limitations under § 3293(2) applies to all charges. *Id.* at 1–2. The court first explains the legal standard under § 3293(2) that the government must satisfy to extend to 10 years the statute of limitations to sustain the jury's conviction for conspiracy, mail fraud, wire fraud. Then, the court considers whether the evidence can support a finding that the government proved this required element beyond a reasonable doubt.

### 1. Legal Standard under 18 U.S.C. § 3293(2)

Generally, "a five-year statute of limitations applies to non-capital federal crimes." *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010). This "default" provision applies to wire fraud, *id.*, as well as mail fraud and conspiracy. 18 U.S.C. § 3282(a); *United States v. McNaul*, No. 6:12-CR-10210-JTM, 2015 WL 3670492, at *2–3 (D. Kan. June 12, 2015). But, 18 U.S.C. § 3293(2) creates an important exception to the five-year rule: if the offense "affects a

financial institution," the government has 10 years to indict the defendant. *Mullins*, 613 F.3d at 1278. Here, all the conduct charged by the Indictment occurred between November 2010 and November 2011—more than five years before the grand jury returned the Indictment in May 2018. Doc. 1. So, to sustain a conviction for mail fraud, wire fraud, or conspiracy, the government had to prove that the extended statute of limitations in § 3293(2) applied to each charge. This extension required the government, in turn, to prove beyond a reasonable doubt that the charged conduct affected a financial institution.

In *United States v. Mullins*, our Circuit considered the meaning of the key phrase in § 3293(2)—"affect[] a financial institution." 613 F.3d at 1278. The Circuit held that this statutory provision requires the government to prove that "the scheme to defraud expose[d] a financial institution to a new or increased risk of loss or cause[d] the financial institution to suffer an actual loss." *Mullins*, 613 F.3d at 1278 (citation and internal quotation marks omitted); *cf. United States v. Agne*, 214 F.3d 47, 52–53 (1st Cir. 2000) (holding defendant's actions did not affect a financial institution because bank suffered no actual or "realistic prospect" of financial loss). The Circuit explained that the word "affect"—in this context—means "simply to 'make a material impression on; to act upon, influence, move, touch, or have an effect on,'" or, "'to have a detrimental influence on'" a financial institution. *Mullins*, 613 F.3d at 1278 (first quoting I *Oxford English Dictionary* 211 (2d ed. 1989); then quoting *Webster's Third New International Dictionary* 35 (2002)). *Mullins* illustrates the kind of conduct that satisfies this requirement.

In that case, various prospective home buyers retained defendant Mullins and her codefendant as their real estate agents. *Id.* at 1276. If they found a prospective buyer who had poor credit, Mullins and her codefendants referred the buyer to two individuals who would "clean up" the buyer's credit so the buyer could qualify for a loan. *Id.* (internal quotation marks

omitted).  They sanitized the aspiring buyer's credit rating by "supply[ing] the buyer with false

pay stubs, W-2 forms, Social Security numbers, rent verifications, and gift letters to help support

the buyer's loan application."  *Id.*  They also established fake companies who, when contacted by

prospective lenders, falsely verified the accuracy of the fraudulent information in the fake

documents.  *Id.*  Then, after the scheme had worked and led the lender to approve the mortgage,

the defendant agents and the so-called "document maker[s] . . . divide[d] the spoils," *i.e.*, the

commission on the property's sale and the fee the buyer had paid for generating the false

documents.  *Id.*  A jury convicted Mullins of four counts of wire fraud, and she appealed.  *Id.* at

1277.

On appeal, Mullins argued that the statute of limitations barred three of her wire fraud

convictions.  *Mullins*, 613 F.3d at 1278.  She argued that the government had failed to prove that

her conduct had exposed any financial institution to a risk of loss, so it could not rely on the 10-

year statute of limitations in § 3293(2).  *Id.*  The Circuit rejected her argument and affirmed the

convictions.  *Id.* at 1280.  In substantial measure, Judge Gorsuch's opinion relied on testimony

by officers for each lender who had made the mortgage loans.  The officers' testimony

"explain[ed] how fraudulent information on a loan application increases the risk of loss to the

lender and its parent bank."  *Id.* at 1279.  Specifically, this testimony explained how the

fraudulent information, *e.g.*, false social security numbers, pay records, and employment

information, "causes the lender to overestimate a borrower's ability to pay off the loan, creating

a greater risk of default, foreclosure, and loss to the lender."  *Id.*  The testifying lenders also

explained how this "greater risk of default, foreclosure and loss" for a mortgage lender "persists

even after the sale of the mortgage to a secondary investor."  *Id.*  Specifically, where fraud later

was discovered, the terms of the mortgage's sale allowed the secondary investor to force the

mortgage company to repurchase the loan despite its reduced value. *Id.* Based on this testimony, the Circuit held that the jury reasonably could have found that the mortgage loans exposed the lenders to a greater risk of loss. *Id.* at 1280. And, the Circuit reasoned, a jury reasonably could have found that "this risk of loss passed through to their parent financial institutions, which would bear any loss the mortgage companies incurred." *Id.* This "looming possibility of harm, even if ultimately not realized, was enough to *affect* the financial institutions for purposes of § 3293(2)."[2] *Id.*

---

[2]      As *Mullins* recognizes, however, not every "influence" on a financial institution will suffice to trigger the 10-year limitations period:

> As some of our sister circuits have recognized, there may be some point where the "influence" a defendant's wire fraud has on a financial institution becomes so attenuated, so remote, so indirect that it cannot trigger the ten-year limitations period because it does not in any meaningful sense "affect" the institution.

613 F.3d at 1278 (first citing *Agne*, 214 F.3d at 52; and then citing *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992)). The facts of *Agne* illustrate conduct insufficient to "affect[ ]" a financial institution.

There, the First Circuit concluded that a supplier's use of fraudulent documents to draw down against a bank's letter of credit was "too remote to sustain the conviction" that relied on the ten-year statute of limitations. 214 F.3d at 52. The First Circuit reached this conclusion because the bank debited the purchaser's account the full amount of the letter of credit shortly after the bank paid the supplier. *Id.* The bank officer also testified that the purchaser "usually maintained ample funds to cover its needs." *Id.* And, the purchaser had agreed in the letter of credit to pay the bank on demand for any draws against the credit, and had "pledged as security for the letter of credit all of its assets in the possession of the bank." *Id.* So, the court of appeals held that the financial institution did not sustain any loss nor was it at any risk of suffering a loss. *Id.* at 52–53. The First Circuit thus vacated defendant's conviction for wire fraud. *Id.* at 57.

In *Pelullo*, the issue was whether defendant's scheme had affected the parent financial institution of the mortgage company implicated in the scheme. 964 F.3d at 214–16. The Third Circuit concluded that it was an "untenable assumption" that a "fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent . . . ." *Id.* at 215. The Circuit contrasted a situation involving a wholly owned subsidiary, *i.e.*, fraud perpetuated against a subsidiary, with a hypothetical situation involving fraud "directed against a customer of the depository institution which was then prejudiced it its dealings with the institution." *Id.* at 216. Evidence of fraud perpetuated against a wholly owned subsidiary, the Third Circuit concluded, could affect the parent financial institution. *Id.* at 215–16. But fraud "directed against a customer of the depository institution [who] was then prejudiced in [the customer's] dealings with the institution" was too "remote" to support an inference that the scheme to defraud had affected a financial institution. *Id.*

Typically, the reported cases show, the government endeavors to establish that a financial institution suffered an actual loss or experienced a "new or increased risk of loss" by presenting testimony from a bank officer explaining how the defendant's conduct affected the financial institution. *Mullins*, 613 F.3d at 1278 (citations and internal quotation marks omitted). Indeed, the government hasn't cited any cases where the government has extended the limitations period under § 3293(2) without testimony by a representative of the financial institution allegedly affected by defendant's fraud. *See, e.g.*, *United States v. O'Brien*, 953 F.3d 449, 456–58 (7th Cir. 2020) (upholding jury finding that fraud had affected financial institution based, in part, on testimony from bank vice president); *Mullins*, 613 F.3d at 1279 (finding sufficient evidence to support jury verdict for wire fraud charged under 10-year statute of limitations because the jury "heard . . . testimony from officers for each mortgage company, explaining how fraudulent information on a loan application increases the risk of loss to the lender and its parent bank"); *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (affirming district court's decision that 10-year statute of limitations in § 3293(2) applied based on testimony by defrauded corporation's manager who explained how defendant's conduct had caused $150,000 loss to corporation's parent company—a financial institution); *Cf. Agne*, 214 F.3d at 51–53 (vacating conviction of wire fraud under 10-year statute of limitations in § 3293(2) because district court "summarily presumed that the bank experienced a risk of loss," and concluding that bank officer's testimony failed to establish that bank faced any actual or prospective loss from defendant's conduct).

The 10-year statute of limitations in § 3293(2) also applies in cases when the defendant has exposed a financial institution to an actual or prospective loss by inducing the institution or its affiliates to act based on false or fraudulent information. *See, e.g.*, *O'Brien*, 953 F.3d at 456–

58 (finding sufficient evidence that defendant's conduct had affected financial institution where defendant had inflated her income and concealed liabilities to secure and then refinance loans); *United States v. Stargell*, 738 F.3d 1018, 1021–22 (9th Cir. 2013) (finding sufficient evidence that defendant's conduct had affected a financial institution where defendant had prepared tax returns containing false wage and tax withholding figures because bank was at risk of not recouping the value of its "refund anticipation loans" when IRS stopped issuing the claimed refunds); *Mullins*, 613 F.3d at 1279–80 (holding defendant's conduct had affected a financial institution because she had helped home buyers secure deceptive financial records to facilitate a mortgage loan, and lender's representatives testified how the false information "increases the risk of loss to the lender and its parent bank"); *Bouyea*, 152 F.3d at 194–95 (holding defendant's scheme to defraud corporation by causing it to lend money based on forged, false, and fraudulent documents had affected corporation's parent financial institution within meaning of § 3293(2)); *Pelullo*, 964 F.2d at 197–98, 214–16 (explaining defendant's wire fraud convictions triggered extended statute of limitations in § 3293(2) where defendant had submitted false documentation to mortgage company to access loan disbursements).

The evidence in this case differed from the evidence in the cited cases.  The government never called a witness from any of the financial institutions who made the pertinent loans. Instead, the government relied on testimony by witnesses who had borrowed money in the form of mortgage loans made by various financial institutions.  The government's case theorized that defendant and her coconspirators falsely had promised that they would help the homeowners secure a replacement mortgage with a lower interest rate.[3]  But, according to the government, the

---

[3]       In its opening statement, the government summarized its view of the evidence:

The plan was Reliant in St. Louis would get the customers through false promises, take in the money, [and] ship the file to The Arize Group . . . .   With the Arize Group, the

conspirators didn't help the owners once they had paid the up-front fee to the conspirators.  The fruits of the scheme consisted of the up-front fees the homeowners paid directly to one of the coconspirators.  In contrast to many of the reported cases, the government presented no evidence that any lender loaned money based on information supplied by defendant or one of her coconspirators.  *See, e.g.*, *Mullins*, 613 F.3d at 1276–77 (defendant conspired with "document makers" who contrived false financial documents for borrower to provide to the lender to secure loans).

Defendant argues that since the government's evidence included no testimony from a financial institution's representative, the government failed to adduce evidence that "such [an] institution suffered any loss or increased risk of loss."  Doc. 142 at 3–4.  This omission, defendant contends, means the five-year statute of limitations applies, and thus, the government charged defendant well after that deadline.  *Id.*

The Indictment charged conduct occurring between November 2010 and November 2011—more than five years before the grand jury returned the Indictment in 2018.  And the government tacitly concedes that no evidence can support a conviction based on conduct occurring within five years of the Indictment.  So, for defendant's convictions to stand, the

---

defendant's business, on occasion they told customers don't pay your mortgage, pay us; you'll have leverage with your mortgage company if you start withholding payments.

The defendant at Arize Group relied heavily on a man named Scott Pattison who they claimed was their legal counsel.  Scott Pattison would draw up the documents to send to the customers and the customers would then demand things from the bank.  If there was something involved in the demand that they did not receive, they would argue that they [should] . . . be free and clear of their mortgage, or [the bank] could offer a lower interest rate.

Doc. 178 at 14–15 (Trial Tr. 14:18–15:8).

government must have proven at trial that the conduct affected a financial institution.[4]  The

government's Response argues that there is no shortcoming of such evidence.  Its Response to

defendant's motion (Doc. 168) contends that several trial exhibits satisfy the requirement

imposed by this element.  And its Supplemental Response (Doc. 187) asserts that testimony by

several witnesses supports a finding that financial institutions faced an actual or increased loss

because of defendant's scheme.

The government's argument appears to be two-fold:  (1) the documents that Arize

instructed its customers to send to their mortgage lenders exposed those financial institutions to a

risk of financial loss (Doc. 168 at 4–8); and (2) Arize's advice to customers—don't make your

monthly mortgage payments—exposed financial institutions to actual losses or a risk of loss

(Doc. 187 at 4–11).  No testimony from any officer for a financial institution supported either

argument.  And, the government's case theorized that defendant's scheme targeted homeowners

by falsely promising to help homeowners secure a lower mortgage rate.  The government never

asserted the scheme actually induced a financial institution to act based on fraudulent

information.  Given this context, the court considers, below, whether the government presented

sufficient evidence for a rational fact-finder to infer that defendant's scheme "affect[ed] a

financial institution."  18 U.S.C. § 3293(2).  The analysis begins with the conspiracy charge

(section 2) and then moves to the substantive charges in the other counts (section 3).

---

[4]      The court's Instructions to the Jury included this "affected" requirement as an element for each
count submitted to the jury.  Doc. 153 at 16, 21, 23 (Instruction Nos. 11, 15, 16).  The pertinent
Instructions explained that a scheme affects a financial institution "if it exposes a financial institution to a
new or increased risk of loss or causes the financial institution to suffer an actual loss."  *Id.* at 16, 22, 24;
*see also Mullins*, 613 F.3d at 1278.

### 2.   Conspiracy to Commit Mail and Wire Fraud (Count 1)

The first question is whether the government presented sufficient evidence for a rational trier of fact to convict on Count 1's charge, conspiracy to commit mail and wire fraud. Doc. 1 at 1–5. Defendant asserts that the government failed to present evidence at trial that any financial institution faced an actual or increased risk of loss. Doc. 142 at 4. For this charge, defendant contends that the evidence shows that she "specifically told Arize customers to make their mortgage payments." *Id.* At best, defendant asserts, the government presented evidence that some victims delayed their mortgage payments because of defendant's scheme. Doc. 191 at 5. Defendant contends this evidence is insufficient to support the conviction. *Id.* On the other hand, the government contends that "overwhelming" evidence shows that defendant's scheme affected financial institutions. Doc. 168 at 11. This is so, the government asserts, because "Arize repeatedly told victims not to make their monthly mortgage payments." Doc. 168 at 11. Instructing customers to forego their monthly mortgage payments, the government asserts, qualifies as "affect[ing] a financial institution." *Id.*

Whether the government presented sufficient evidence to sustain the conviction on this count presents a relatively close question. As explained above, to "affect[ ] a financial institution" means to expose a financial institution to a new or increased risk of loss. *Mullins*, 613 F.3d at 1278. It requires "simply to 'make a material impression on; to act upon, influence, move, touch, or have an effect on,'" or, "'to have a detrimental influence on'" a financial institution. *Id.* (first quoting I *Oxford English Dictionary* 211 (2d ed. 1989); and then quoting *Webster's Third New International Dictionary* 35 (2002)). In *Mullins*, the evidence showed defendant had helped home buyers secure false documents—*e.g.*, false pay stubs, social security numbers, and employment information—used to support mortgage loan applications. *Id.* at

13

1276.  Then, the evidence showed, defendant had erected ruse companies to confirm the

fraudulent information to the financial institution.  *Id.*  Officers for each mortgage company

testified how fraudulent information on loan applications increased the risk of loss for the lender

and its parent bank.  *Id.* at 1279.  The Tenth Circuit held that this evidence was sufficient to infer

that defendant's conduct had "affect[ed] a financial institution" under § 3293(2).  *Id.* at 1280.

But here, the effect of defendant's conduct—and that of her coconspirators—was more

attenuated.  The coconspirators never supplied any false or fraudulent information to mortgage

lenders.  They never confirmed any false information to the lenders.  They never directly induced

lenders to act at all.  Indeed, the government's theory of the case was that defendant's scheme

solely was intended to defraud customers.  The government asserted that customers paid Arize

upfront fees for "loan modifications" to help them secure a lower mortgage rate.  Doc. 185 at 24

(Trial Tr. 1752:17–24).  But then, the government argued, Arize offered customers "no analysis

tool, no computer tool, no product, no tangible anything."  *Id.* at 37 (Trial Tr. 1765:12–15).  The

scheme, the government contended, was a "scam from the beginning."  *Id.* at 28 (Trial Tr.

1756:7–8).  The documents Arize supplied its customers—which Arize represented would

induce lenders to lower mortgage rates—"were bogus and of no value," according to the

government.  Doc. 178 at 15 (Trial Tr. 15:9–15).  In sum, the government's theory at trial was

that defendant's scheme scammed borrowers into paying for something that never could have

worked.

While defendant's scheme never directly influenced lenders, the evidence established that

her coconspirators advised customers to withhold mortgage payments from their lenders.  James

J. testified that someone at Arize instructed him to stop paying his mortgage, although he

continued to pay it.  Doc. 178 at 168 (Trial Tr. 168:2–6).  At Arize's advice, Tammy A. testified

14

that she skipped three monthly mortgage payments.  Doc. 179 at 179 (Trial Tr. 437:9–12).  She

explained that someone at Arize advised her that so long as she wasn't behind more than three

months on her payments, the mortgage company would not foreclose on her house.  *Id.* at 176

(Trial Tr. 434:12–19).  She testified that she thought Arize was incorporating the fee she paid

Arize into her mortgage payments.  *Id.* at 177 (Trial Tr. 435:2–10).  Later, after she explained the

circumstances, her lender tacked her missed payments onto the end of the life of her loan.  *Id.* at

180 (Trial Tr. 438:3–6).  Finally, according to Bruce S., a "gentleman" with Reliant told him "it

might be a really good idea" to withhold mortgage payments to "put pressure on the company" to

lower his interest rates.  *Id.* at 30–31 (Trial Tr. 288:21–289:11).  Bruce S. followed this advice

and skipped three payments.  *Id.* at 31 (Trial Tr. 289:12–20).  Before missing these payments, he

had been current on his mortgage and he could have afforded to make the missed payments.  *Id.*

at 30, 31 (Trial Tr. 288:15–17, 289:16–17).  The missed payments led the mortgage lender to

threaten foreclosure on his home.  *Id.* at 31 (Trial Tr. 289:21–24).  When Bruce S. began

receiving foreclosure notices, he made up the three payments he had skipped.  *Id.* at 51 (Trial Tr.

309:16–24).

 The government contends that missed payments, and potential missed payments, are

enough to prove an actual loss or a "new or increased risk of loss" to financial institutions.  Doc.

187 at 11.  Defendant, meanwhile, characterizes these payments merely as "delayed."  Doc. 191

at 5.  And, she contends, the government presumes that delayed mortgage payments affected a

financial institution "without any evidence or stated rule of law to support the presumption."  *Id.*

Our Circuit has recognized that "there may be some point where the 'influence' a

defendant's wire fraud has on a financial institution becomes so attenuated, so remote, so indirect

that it cannot trigger the ten-year limitations period because it does not in any meaningful sense

'affect' the institution." *Mullins*, 613 F.3d at 1278.  Using a financial institution "as a conduit for funds with no attendant risk of loss to the institution, for example, might not do it." *Id*.  But successfully inducing a mortgage lender to approve a loan application by submitting false information, and then verifying the false information, affects a financial institution under § 3293(2).  *Id.* at 1280.

Here, the conduct of defendant and her coconspirators falls somewhere between these two points.  They never submitted fraudulent information to mortgage lenders.  No evidence suggested that defendant or fellow conspirators submitted false information to mortgage lenders or other financial institutions.  The government theorized that Arize and Reliant employees knew the scheme never would persuade lenders to modify loan terms.  But the scheme involved more than simply using a financial institution as a conduit for funds.  As part of their scheme, defendant's coconspirators instructed customers to withhold mortgage payments from their lenders, advising them it would pressure lenders to lower their interest rates.  And some of the customers followed the conspiracy's instructions.

James J. testified that someone at Arize instructed him to stop paying his mortgage, but he ignored this advice.  Doc. 178 at 168 (Trial Tr. 168:2–6).  Instead, he continued making his payments because he "d[idn't] like not to pay bills" and thought it was a bad idea.  *Id.* (Trial Tr. 168:7–13).  The government asserts that Arize's advice nonetheless placed James J.'s lender "at an increased risk of loss because of the potential missed payments."  Doc. 187 at 11.  But based on this evidence alone, no rational jury could conclude that his lender suffered "actual financial loss" or a "realistic prospect of loss."  *Agne*, 214 F.3d at 53.  *Agne* explains why this kind of evidence won't carry the day.  The court noted that a bank *could* be affected by someone using fraudulent documents to draw on the funds of another.  *Id.*  But the First Circuit held that the

bank faced no realistic prospect of loss because, in part, there were ample funds in the account to cover the letter of the credit.  *Id.* at 52.  Similarly, here, the coconspirators advice to James J. produced no "realistic prospect of loss."  *Id.* at 53.  He dismissed Arize's advice and continued making his mortgage payments.  The court concludes that  James J.'s testimony—by itself— could not sustain Count 1's conspiracy conviction.  But there is more.

Tammy A. and Bruce S. both testified that they actually followed Arize's advice to forgo their mortgage payments.  Tammy A. missed three payments after someone with Arize assured her that her lender would not foreclose so long as she was not more than three months delinquent on her payments.  She testified that she eventually made up her missed payments after receiving foreclosure notices and explaining to her lender "exactly what she had fallen for." Doc. 179 at 179–80 (Trial Tr. 437:16–18, 438:3–6).  Her lender simply added the missed payments to the end of the life of her loan and charged her late fees.  *Id.*  Similarly, Bruce S. withheld three mortgage payments after a coconspirator advised him the strategy would "pressure" the mortgage company to lower his interest rate.  *Id.* at 30–31 (Trial Tr. 288:21– 289:11).  When Bruce S. began missing payments, he received an "aggressive" foreclosure letter from his lender.  *Id.* at 51 (Trial Tr. 309:16–20).  He then made the payments he had missed, and never missed any subsequent payments.

The court concludes that evidence of these missed payments—and the threat of foreclosure they produced—provided sufficient evidence for a rational trier of fact to infer that the scheme exposed a financial institution to a risk of loss.  *Mullins*, 613 F.3d at 1278–79.  Bruce S. and Tammy A. missed three mortgage payments because defendant's coconspirators informed them it was a sound loan modification strategy.  Recognizing that these missed payments exposed them to a potential loss, their lenders sent notices threatening foreclosure.  Duping

customers into withholding mortgage payments from a financial institution is not conduct "so attenuated, so remote, so indirect" that it does not affect a financial institution. *Mullins*, 613 F.3d at 1278. Although Bruce S. and Tammy A. eventually made the missed payments, the missed payments still exposed their financial institutions to "an increased risk of loss." *Id.* at 1280.

Defendant counters this inference with the argument that private mortgage insurance would have protected lenders from loss, and the evidence shows that the mortgages at issue were securitized. Doc. 191 at 6. So, defendant argues, the government would have had to prove the home was worth less than the mortgage to prove potential loss. *Id.* But this argument overstates the standard. As *Mullins* explained, "Congress certainly could have extended the limitations period only when wire fraud 'causes a loss' to a financial institution," but "it chose instead to use the considerably broader term 'affects.'" 613 F.3d at 1278. And, *Mullins* ruled, "affects" means merely to expose a financial institution to a risk of loss. *Id.* at 1278–79. The "looming possibility of harm, even if ultimately not realized" is "enough to *affect* the financial institutions for purposes of § 3293(2)." *Id.* at 1280. Bruce S. and Tammy A.'s lenders received delayed mortgage payments, exposing them to a risk of not recouping those payments, and potentially incurring foreclosure and associated costs. This effect is not "so attenuated, so remote, so indirect that it cannot trigger the ten-year limitations period . . . ." *Id.* at 1278. The court thus concludes that the conduct of defendant's coconspirators provided a sufficient basis for a rational jury to find that defendant's scheme affected a financial institution for purposes of § 3293(2). The court thus concludes that the government presented sufficient evidence to sustain the jury's verdict on Count 1.

### 3. The Substantive Charges of Mail and Wire Fraud (Counts 2-6 and 8 and 9)

#### a. Overview

The substantive charges in Count 2 (mail fraud under § 1341) and Counts 3-6 and 8 and 9 (wire fraud under § 1343) also relied on the extended statute of limitations in § 3293(2).  As with the conspiracy charge, extending the statute of limitations to 10 years required the government to establish that defendant's scheme "affect[ed] a financial institution."  *See Mullins*, 613 F.3d at 1278 (sustaining wire fraud convictions required proof of "new or increased risk of loss" or "an actual loss").

The evidence germane to these seven charges falls into two distinct groups.  The first group consists of Counts 2-6.  For this first group of charges, the court concludes that the government failed to prove that defendant's scheme to defraud affected a financial institution.  It thus grants defendant's motion and enters a judgment of acquittal.  The second group of charges consists of Counts 8 and 9.  On these charges, the court concludes the government has carried its burden.  So the court denies defendant's motion on these charges.  The court explains its rationale in the following sections.

#### b. The first group of charges (Counts 2-6)

#### (1) Count 2 (Mail Fraud)

Count 2's mail fraud charge alleges that on May 16, 2011, defendant "placed and caused to be placed in an authorized depository for mail . . . a letter mailed from The Arize Group to Thomas M. . . . with that letter containing a formal offer and demand letter."  Doc. 1 at 5–6.  The government's Supplemental Response asserts that Thomas M.—the alleged victim of defendant's fraud—sent the two "Formal Offer and Demand Letters" to his lender.  Doc. 187 at 7–8; *see also* Doc. 179 at 161–64 (Trial Tr. 419:6–422:19).  Thomas M.'s lender responded to

19

these submissions, and he summarized the response this way: "[T]he mortgage company replied saying they didn't know what [he] was trying to prove, and that . . . [he was] liable for the mortgage . . . ." Doc. 179 at 123 (Trial Tr. 381:3–8). The lender's correspondence informed Thomas M. that it did not "believe [his] allegations [were] legitimate," and that he still was obligated "to comply with the loan documents and make all payments . . . . in the correct amount and on time" to avoid late charges and possible credit reporting. Def. Ex. 603. The government never explains how this exchange exposed the mortgage company to an actual or prospective loss.

Indeed, the government concedes that Thomas M. "made all of his mortgage payments . . . on time, but [he] missed some taxes." Doc. 187 at 8; Doc. 179 at 168 (Trial Tr. 426:8–20). In the government's view, Thomas M.'s testimony is "clear evidence" that the "financial institution [was] at an increased risk of loss." Doc. 187 at 10. The government reasons that the lender's correspondence to Thomas M. "makes [it] clear that the financial institution was not confident that Thomas M. would continue to timely pay his mortgage and reminded him that in order to avoid late fees and penalties he needed to pay his monthly mortgage in the correct amount and on time." *Id.*

It's not evident how the lender sending a letter to Thomas M. that he must pay his mortgage on time and in the correct amount could justify an inference that it "was not confident" he would pay his mortgage. And, even if Thomas M.'s "Formal Offer and Demand Letters" somehow undermined the lender's confidence that Thomas M. would continue making timely mortgage payments, confidence isn't the issue. The controlling question is whether the government presented sufficient evidence for a reasonable jury to conclude defendant's conduct exposed a financial institution to an actual loss or a "new or increased risk of loss." *Mullins*, 613

20

F.3d at 1278 (internal quotation marks omitted).  The government presented no evidence that Thomas M.'s mortgage lender experienced a loss or a new or increased risk of loss.  At most, Thomas M. failed to pay some city taxes, but that omission affected a government institution— not a financial institution.  Finding the evidence—even when viewed in the light most favorable to the government—insufficient to support a finding that defendant's scheme to defraud exposed a financial institution to an actual or prospective loss, the court grants defendant's motion for acquittal on Count 2.

### (2) Counts 3-5 (Wire Fraud)

Count 3's wire fraud charge relies on an email advertising a loan audit package from John McDuffy, a Reliant employee, to James J.—the alleged victim of the crimes charged by Counts 3, 4, and 5.  Gov. Ex. 151-3.  Count 4's wire fraud charge relies on an email from defendant to James J. requesting financial documents.  Gov. Ex. 40.  And Count 5's wire fraud charge relies on a "Formal Offer and Demand Letter" that Arize provided James J.  Gov. Ex. 106.

The evidence established that James J. purchased his home in 2008.  Doc. 178 at 161 (Trial Tr. 161:5–7).  Bank of America held his mortgage when he was involved with Arize.  *Id.* (Trial Tr. 161:8–11).  James J. contacted Arize or Reliant—he was unsure which company he contacted initially—because he had received a piece of mail from them and believed they could help him secure a new mortgage.  *Id.* at 162–63 (Trial Tr. 162:10–163:18).  James J. explained that he engaged Arize because, over time, a lower interest rate would have saved him "hundreds of thousands of dollars."  *Id.* at 164 (Trial Tr. 164:3–8).  He paid Arize $3,000 to help him secure a new mortgage.  *Id.* (Trial Tr. 164:17–21).

Arize provided James J. a "Formal Offer and Demand Letter" to submit to his mortgage lender. *Id.* at 177 (Trial Tr. 177:20–24).  He sent the letter to Bank of America's CEO.  *Id.* at 178–79 (Trial Tr. 178:19–179:2).  James J. hoped the letter would help him secure a 2% interest rate. *Id.* at 177 (Trial Tr. 177:20–22).  But "nothing" happened as a result of the letter, James J. testified.  *Id.* at 179 (Trial Tr. 179:3–5).  Someone with Arize also advised James J. to stop making his mortgage payments.  *Id.* at 168 (Trial Tr. 168:2–4).  But he continued making his mortgage payments anyway, because he "d[idn't] like not to pay bills."  *Id.* (Trial Tr. 168:5–8). In the end, Arize kept James J.'s money, but never helped him secure a lower mortgage rate.  *Id.* at 167 (167:14–22).

The government asserts that defendant's scheme placed James J.'s lender "at an increased risk of loss because of the potential missed payments."  Doc. 187 at 11.  But *potential* missed payments do not amount to an actual or realistic prospect of loss, as *Agne* illustrates.  214 F.3d at 53.  In that case, a bank actually disbursed funds under a letter of credit based on fraudulent documents submitted by the defendant to the bank.  *Id.* at 52.  The First Circuit held that defendant's conduct hadn't "affect[ed]" a financial institution because the beneficiary of the letter of credit "usually maintained ample funds" in its accounts with the bank and it had promised to pay the bank "on demand" for any payments issued under the letter of credit.  *Id.* at 53.  If that risk was too attenuated to support the requisite "affect[ed]" requirement—and *Agne* held it was—it stands to reason that unsuccessfully encouraging a mortgage borrower to withhold payments won't suffice either.  Indeed, our Circuit has cited *Agne* for this principle. *See Mullins*, 613 F.3d at 1278 (Tenth Circuit citing *Agne* as example of holdings by sister circuits where "the 'influence' [of] a defendant's wire fraud . . . on a financial institution [is] so

attenuated, so remote, so indirect that it cannot trigger" the 10-year statute of limitations "because it does not in any meaningful sense 'affect' the institution").

The government adduced insufficient evidence that James J.'s lender modified its behavior or loss exposure because of defendant's scheme. As James J. testified, his lender never acknowledged his "Formal Offer and Demand Letter" and he simply continued making timely mortgage payments. The government has failed to present sufficient evidence that defendant's scheme affected a financial institution for purposes of § 3293(2). For this reason, the statute of limitations bars defendant's convictions and the court grants her motion on Counts 3-5 of the Indictment.

### (3) Count 6 (Wire Fraud)

Mary J.S. is the alleged victim of Count 6. She testified that she contacted Arize around late 2010 or early 2011. Doc. 178 at 203 (Trial Tr. 203:20–22). At the time of that contact, she already had skipped "a few payments" owed to her mortgage lender because she couldn't afford to make the payments. *Id.* at 204 (Trial Tr. 204:6–16). In March 2011, during the "frustrating process" of applying for home affordability programs through her lender, she sent her first check to Arize. *Id.* at 241–44 (Trial Tr. 241:18–242:5; 243:23–244:11). She hoped to secure a loan reduction or modification through Arize so that she could resume making full monthly payments. *Id.* at 205 (Trial Tr. 205:7–11). She paid Arize nearly $3,000 over the course of a few months. *Id.* at 206 (Trial Tr. 206:1–5). Later, in November 2011, she sent a letter to Seterus, her mortgage lender. The letter explained her financial circumstances, and stated, in part, the following:

> Since I had not received any word, in April, 2011, at the advice of family I contacted The Arize Group, Inc[.] of Shawnee, KS to assist me in obtaining the mortgage loan modification. I paid these people $2988 for their services instead of paying IBM Lenders Services for two months, April and May, 2011.

23

Doc. 168 at 8 (citing Gov. Ex. 123 at 2).  The government asserts that this letter is "clear evidence that defendant's scheme affected a financial institution."  *Id.* at 8–9.

The court is unpersuaded that this evidence can support a reasonable finding that defendant's scheme "affect[ed] a financial institution" for purposes of § 3293(2).  Although the evidence shows that Mary J.S. informed her lender that she had paid Arize instead of making her mortgage payments, no evidence shows that defendant or anyone at Arize or Reliant ever advised Mary J.S. to skip her mortgage payments.  Mary J.S.'s independent decision to skip those payments does not support a rational inference that defendant's scheme "affect[ed] a financial institution."  § 3293(2).  In this setting, defendant's wire fraud simply was too "remote" and "indirect" to trigger the 10-year limitations period.  *Mullins*, 613 F.3d at 1278 (citing *Pelullo*, 964 F.3d at 216 (explaining that effect on financial institution may be too "unreasonably remote" to trigger 10-year limitations period where fraud is directed against a customer of the financial institution, who is then prejudiced in its dealings with the institution)).

The government also cites various correspondence Mary J.S. received from her lender as "clear evidence that defendant's scheme affected financial institutions."  Doc. 168 at 8–9.  The evidence included three pieces of correspondence to Mary J.S.  First, Mary J.S. received a letter from her loan servicer in October 2010.  *Id.* (citing Def. Ex. 562).  The letter informed Mary J.S. that her lender had received her request for assistance and would evaluate it.  But in the meantime, her lender would continue to try to collect from her, and might initiate foreclosure proceedings.  *Id.*  Then, in November 2010, her loan servicer—in response to her missing her most recent mortgage payment—sent her a letter offering her the opportunity to avoid foreclosure through a "short sale" of her property.  *Id.* at 9 (citing Def. Ex. 565).  Finally, in December 2010, the lender sent Mary J.S. a letter informing her that she had defaulted on her

mortgage and presented her with options to resolve the delinquency of her loan.  *Id.* (citing Def. Ex. 566).

The problem is that Mary J.S. received all this correspondence from her lender months before she paid Arize in April 2011.  Doc. 178 at 243–44 (Trial Tr. 233:22–234:11).  She already was struggling to make her mortgage payments before she sought Arize's assistance.  Doc. 178 at 235 (Trial Tr. 235:8–23) ("I was sending them money.  I wasn't sending them the whole thing, but they were accepting the checks.").  Evidence that Mary J.S. had failed to make mortgage payments *before* she became involved in defendant's fraudulent scheme doesn't support a rational inference that defendant's scheme affected a financial institution.

In sum, the evidence is insufficient to support a rational finding that defendant's scheme affected a financial institution.  Mary J.S. independently decided to pay Arize instead of paying her mortgage, to the extent she would have been able to pay it given her financial problems.  And no evidence suggests that her lender modified its behavior or loss exposure because of defendant's scheme.  The lender's letters about delinquent mortgage payments and options to resolve those delinquencies—sent months before Mary J.S. contacted Arize—cannot support the inference that defendant's scheme affected a financial institution.  The statute of limitations bars the conviction, and the court grants defendant's motion on Count 6.

### c.  The second group of charges:  Counts 8 and 9

Counts 8 and 9 also charge wire fraud.  Count 8's wire fraud charge relies on an email from defendant to Bruce S., the alleged victim.  Defendant's email informed Bruce S. that she had sent a letter to Arize's "paralegal" for "them" to send to Bruce S.'s mortgage lender, Ocwen. Gov. Ex. 37.  Count 9's wire fraud charge relies on a "Formal Offer and Demand Letter" Reliant

had provided Bruce S. and instructed him to send to Ocwen.  Gov. Ex. 116; Doc. 179 at 45 (Trial

Tr. 303:4–10).

Bruce S. initially contacted Reliant because he hoped to secure a lower interest rate on his

mortgage.  Doc. 179 at 29 (Trial Tr. 287:11–15).  Around that time, a "gentleman" with Reliant

advised him "it might be a really good idea" to withhold mortgage payments to "put pressure on

the company" to lower his interest rates.  *Id.* at 30–31 (Trial Tr. 288:21–289:11); *id.* at 50–51

(Trial Tr. 308:17–309:2).  Bruce S. followed this advice and skipped three payments.  *Id.* at 31

(Trial Tr. 289:12–20).  Before Bruce S. missed these payments, he had been current on his

mortgage payments and would have made the payments if not for the advice he received.  *Id.* at

30, 31 (Trial Tr. 288:15–17, 289:16–17).  He also sent a "Formal Offer and Demand Letter" to

the CEO of Ocwen, seeking a lower mortgage rate.  *Id.* at 45 (Trial Tr. 303:8–14).

Neither strategy worked.  When Ocwen began sending foreclosure notices to Bruce S., he

made up the three payments he had skipped.  *Id.* at 51 (Trial Tr. 309:16–24).  And Ocwen

responded to his "Formal Offer and Demand Letter" with a "basic letter that said [he was] not

eligible."  *Id.* at 45 (Trial Tr. 303:17–21).  Bruce S. described the letter as a "blanket" response

that said, in essence, "sorry, but we're . . . not doing anything."  *Id.*  Despite paying Arize and

Reliant a total of $3,489, he never secured a loan modification.  *Id.* at 42 (Trial Tr. 300:23–25);

*id.* at 48 (Trial Tr. 306:10–22).

As explained in Part II.B.2 (Conspiracy to Commit Mail and Wire Fraud), duping

customers into withholding mortgage payments from a financial institution is not conduct "so

attenuated, so remote, so indirect" that it does not affect a financial institution.  *Mullins*, 613 F.3d

at 1278.  Although Bruce S. eventually made the missed payments, it still exposed his financial

institution to "an increased risk of loss."  *Id.* at 1280.  As *Mullins* explained, "Congress certainly

could have extended the limitations period only when wire fraud 'causes a loss' to a financial institution," but "it chose instead to use the considerably broader term 'affects.'"  613 F.3d at 1278.  And, *Mullins* ruled, the "affects" requirement merely requires proof that defendant's scheme exposed a financial institution to a risk of loss.  *Id.* at 1278–79.  The "looming possibility of harm, even if ultimately not realized" is "enough to *affect* the financial institutions for purposes of § 3293(2)."  *Id.* at 1280.

Bruce S.'s mortgage payments were delayed, exposing his lender to a risk of not recouping those payments, and potentially incurring foreclosure and associated costs.  This effect is not "so attenuated, so remote, so indirect that it cannot trigger the ten-year limitations period . . . ."  *Id.* at 1278.  The court thus concludes that the evidence of Bruce S.'s delayed mortgage payments provides sufficient basis for a rational jury to find that defendant's scheme affected a financial institution for purposes of § 3293(2).  The court thus concludes that the government presented sufficient evidence to sustain the jury's verdict on Counts 8 and 9.

### C.  Conclusion

The court grants defendant's Motion for Judgment of Acquittal (Doc. 142) in part and denies it in part.  Specifically, the courts sustains Count 1's conspiracy to commit mail and wire fraud, and Count 8 and 9's wire fraud convictions.  But the evidence cannot sustain the jury's verdict on Counts 2, 3, 4, 5, or 6 because the government failed to present evidence capable of supporting a rational finding that defendant's scheme "affect[ed] a financial institution."  18 U.S.C. § 3293(2).  So, the statute of limitations bars these convictions.  But because the government has presented sufficient evidence to sustain three of defendant's convictions, the court now considers her Motion for New Trial (Doc. 163) as it applies to Counts 1, 8, and 9.

### III.    Motion for New Trial

As an alternative to her acquittal motion, defendant filed a Motion for New Trial (Doc. 163).  Her motion asserts that a new trial is warranted for several reasons.  Two of those reasons are germane here:  (1) the government introduced a new "aiding and abetting" theory of liability during the rebuttal portion of its closing argument, and (2) the court provided the jury a supplemental instruction on "aiding and abetting" in response to a question the jury submitted to the court about this "aiding and abetting" theory.  Doc. 163 at 5–6.  The court's analysis of this motion, below, begins with the legal standard applying to motions under Fed. R. Crim. P. 33. The court then turns to the substance of defendant's motion.

### A.  Legal Standard

Fed. R. Crim. P. 33 provides that the court may grant a motion for a new trial "if the interest of justice so requires."  The Rule "recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial."  3 Charles Alan Wright and Sarah N. Welling, *Federal Practice and Procedure* § 581 (4th ed. 2011).  But a motion for new trial is granted "with great caution."  *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999).  "The defendant has the burden of proving the necessity of a new trial." *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994) (further citations omitted)).  And, the decision whether to grant a motion for new trial is committed to the trial court's sound discretion.  *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009); *Herrera*, 481 F.3d at 1270; *Quintanilla*, 193 F.3d at 1146.

28

**B.  Discussion**

In Section 1, the court describes the government's closing argument and the substance of defendant's motion.  Section 2 addresses the fairness of defendant's trial.

**1.  Background**

Count 1 of the Indictment charged conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349 and aiding and abetting under 18 U.S.C. § 2.  Doc. 1 at 5.  Counts 8 and 9 charged wire fraud under 18 U.S.C. § 1343 and aiding and abetting under 18 U.S.C. § 2.  *Id.* at 6–7.  The Jury Instructions submitted these charges and instructed the jury about them.  *See* Doc. 153 at 16, 18, 23 (Instruction No. 11) ("The defendant is charged in Count 1 with a violation of Title 18 United States Code § 1349 and 2."), (Instruction No. 12) ("Count 1 charges that the defendant was a member of one single conspiracy to devise a scheme to defraud homeowners or other debtors, or in the alternative, aiding and abetting to commit the crime of conspiracy to devise a scheme to defraud homeowners and other debtors."), (Instruction No. 16) ("The defendant is charged in Counts 3 through 6 and Counts 8 and 9 with violations of 18 United States Code § 1343 and 2; that is, Wire Fraud.").  But the Instructions never defined "aiding and abetting."  The government submitted a proposed "aiding and abetting" jury instruction (Doc. 108, Amended Government's Proposed Jury Instructions), but the court did not include the instruction in its proposed instructions for the Fed. R. Crim. P. 30 conference.  Neither party asked for such an instruction during the Rule 30 conference, held before closing arguments.

During the first stage of closing argument, the prosecutor argued that the government had proved Count 1, the conspiracy count, beyond a reasonable doubt.  While showing the jury a

slide listing the elements of Count 1 (Doc. 163-1 at 3),[5] the prosecutor argued that the

government had carried its burden on each element of the charged crime:

> Count 1, conspiracy to commit wire fraud and mail fraud elements.  It's no doubt
> [the government has] met the first element here that she, along with others, devised
> a scheme to defraud homeowners and debtors.  She knew the essential object of the
> conspiracy and that she knowingly and voluntarily participated in this conspiracy.
> There was interdependence among these individuals, and that it affected a financial
> institution.

Doc. 185 at 25 (Trial Tr. 1753:3–9).  The first installment of the prosecutor's closing argument

never mentioned aiding and abetting.  Instead, the government presented its view of the

evidence, and urged the jury to reject defendant's good faith defense.  At the close of stage 1 of

its closing argument, the government reserved the balance of its time for rebuttal.

Defense counsel then gave her closing argument.  As the government had predicted, her

argument focused on defendant's state of mind.  *Id.* at 40 (Trial Tr. 1768:20–24).  Defense

counsel argued that the evidence showed defendant lacked specific intent to defraud, an essential

element of each of the charged crimes.  *Id.* at 46 (Trial Tr. 1774:19–21).  Defendant then argued

a "good faith" defense, contending that she honestly had believed Arize's mortgage loan

modification scheme would help homeowners secure lower mortgage rates.[6]  *Id.* at 46–47 (Trial

---

[5]     The government's slide listed four elements of Count 1, conspiracy to commit mail and wire
fraud:  (1) the defendant agreed with at least one other person to devise a scheme to defraud homeowners
or other debtors, (2) the defendant knew the essential object of the conspiracy, (3) the defendant
knowingly and voluntarily participated in the conspiracy, and (4) there was interdependence among
members of the conspiracy.  Doc. 163-1 at 3.  Because the government had created the slide for its
presentation before the court had added "specific intent to defraud" as an element of Count 1 in the Jury
Instructions, the slide omitted that element.  Doc. 185 at 25–26 (Trial Tr. 1753:13–1754:6).  The slide
also omitted the "affects a financial institution" element.  *See* Doc. 163-1 at 3.  The court permitted the
government to show the jury the slide despite these omissions, so long as it clarified to the jury that the
elements shown on the slide were not comprehensive and that the Jury Instructions provide the
controlling elements of the charged crime—not the government's slide presentation.  Doc. 185 at 26
(Trial Tr. 1754:7–12).

[6]     The Jury Instructions provided, in part, that "[t]he good faith of a defendant, whether objectively
reasonable or unreasonable, is a complete defense to all of the crimes charged by the Indictment because

Tr. 1774:22–1775:17).  In sum, defense counsel argued, the jury should acquit defendant on all counts because "when she was [working at Arize], she didn't realize what was going on until the day that she left.  When she was in it, she had an honest belief that what she was doing was going to help people, a good faith belief that this process would work for her." *Id.* at 65–66 (Trial Tr. 1793:22–1794:4).  Defense counsel also argued that the government hadn't proved an agreement to devise a scheme to defraud between defendant and other members of the conspiracy, another essential element of the charge.  *Id.* at 52–55 (Trial Tr. 1780:16–1783:10).  Defendant's closing argument never discussed or even alluded to aiding and abetting.  Instead, her closing argument focused solely on defendant's state of mind and whether she had agreed with her coconspirators to devise a scheme to defraud homeowners and other debtors.

Then, the government closed the argument with its rebuttal.  The prosecutor argued that the evidence showed defendant possessed specific intent to defraud because the scheme was "a scam from the start."  Doc. 185 at 66 (Trial Tr. 1794:22–24).  Arize, the government argued, never had any ability to deliver on its promises to homeowners.  *Id.* at 67 (Trial Tr. 1795:8–9).  Defendant knew the process didn't work, despite what she told customers.  *Id.* at 70 (Trial Tr. 1798:3–13).  Next, the government argued, defendant was responsible for the actions of her "business partners" and coconspirators.  *Id.* at 72 (Trial Tr. 1800:5–9).  Finally, the government concluded its rebuttal by explaining that the jury could convict defendant on an aiding and abetting theory:

> The defendant is charged with conspiracy to commit mail and wire fraud.  In Section 2 is the aiding and abetting statute.  What's key about this is that if you don't believe that she did what she did on her own, she assisted, she aided and abetted others to do those things of which she's charged too as well.  So take a look at that.  I think that's key.

---

good faith negates the intent to defraud required to commit those crimes."  Doc. 153 at 28 (Instruction No. 20).

*Id.* at 73 (Trial Tr. 1801:15–20).  The prosecutor also projected a copy of Jury Instruction No.

12—the conspiracy instruction—for the jury to view.  This Instruction provided that "Count 1

charges that the defendant was a member of one single conspiracy to devise a scheme to defraud

homeowners or other debtors, or in the alternative, aiding and abetting to commit the crime of

conspiracy to devise a scheme to defraud homeowners or other debtors."  Doc. 163-2.  On the

copy of Instruction No. 12 shown to the jury, the prosecutor had drawn brackets around "aiding

and abetting" and a line to the margin of the page.  *Id.*  In the margin, the prosecutor had

handwritten "Section 2!"  *Id.*  Defendant didn't object during the government's rebuttal (or even

after the court submitted the case to the jury).

During its deliberations, the jury submitted four questions to the court.  Doc. 154.  The

second question asked, "Does it matter—what is the definition of 'aiding and abetting to devise a

scheme to defraud[?]'"  *Id.* at 1.  The court ordered the parties to submit briefing addressing the

proper response to this question.  Defendant filed an Objection to Aiding and Abetting

Instruction (Doc. 149).  It asked the court to provide the jury a modified Instruction No. 12,

removing the "aiding and abetting" reference.  Doc. 149 at 2.  Defendant reasoned that (1) the

Tenth Circuit has not "squarely ruled" whether one can aid and abet a conspiracy (*id.* at 3), (2)

the government had not presented sufficient evidence to support an aiding and abetting theory of

liability (*id.* at 3–5), and finally, (3) the government had waived its aiding and abetting theory

because it had not argued it in closing argument (*id.* at 5–6).  The government filed a Response

(Doc. 151).  It asked the court to provide a supplemental instruction defining "aiding and

abetting" based on the Tenth Circuit's Pattern Instructions.  Doc. 151 at 3–4 (Government's

Response ¶ 8).  Defendant, the government contended, had been "on notice that she is charged

with aiding and abetting" because the Indictment charged her with violating 18 U.S.C. § 2.  *Id.* at 3 (Government's Response ¶ 7).

Binding precedent provides that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."  *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946); *see also United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018) ("'[A] district judge has a duty to guide the jury toward an intelligent understanding of the legal and factual issues it must resolve, particularly when the jury asks a question revealing its confusion over a central issue of the case.'" (quoting *Schultz v. Rice*, 809 F.2d 643, 650 (10th Cir. 1986))).  Relying on this precedent, the court submitted a supplemental instruction defining "aiding and abetting."  Doc. 186 at 3 (Trial Tr. 1822:17–25).  With two alterations that aren't pertinent to the current issue, the court informed the parties that it planned to provide the Tenth Circuit Pattern Instruction for "aiding and abetting."  *Id.* at 5–6 (Trial Tr. 1824:6–1825:2).

Defendant objected to the supplemental instruction.  She again argued that the government had waived the aiding and abetting theory.  *Id.* at 6–7 (Trial Tr. 1825:15–1826:7).  Defendant asserted that although the Indictment charged aiding and abetting, the Indictment alone does not preserve the argument for the government to raise it for the first time on rebuttal.  *Id.* at 7 (Trial Tr. 1826:4–7).  Defendant asked the court to remove the "aiding and abetting" language from Jury Instruction No. 12, clarifying for the jury that it should not consider that language.  *Id.* (Trial Tr. 1826:4–7).  Alternatively, defendant asked for supplemental argument.  *Id.* (Trial Tr. 1826:14–18).  The court overruled defendant's objection.  *Id.* at 13 (Trial Tr. 1832:12–19).  Since Instruction No. 12 used the term "aiding and abetting," and the jury had asked a question about this theory, the court elected to give the supplemental instruction.  *Id.*

The jury returned a guilty verdict on all counts.  Post-trial, defendant filed her motion seeking a new trial that is now before the court.  Her motion renews her objection to the government's "aiding and abetting" theory of liability raised on rebuttal and the supplemental instruction.  Doc. 163 at 7.  The court thus considers whether the "interest of justice" requires a new trial.  Fed. R. Crim. P. 33.

### 2. Fairness of Defendant's Trial

"The test for whether a defendant's trial was fundamentally unfair based on a prosecutor's comments proceeds in two steps:  (1) the court first decides whether the prosecutor's comments were improper, and (2) if so, it examines their likely effect on the jury's verdict."  *United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019) (citations omitted).  "The court thus must weigh any improper comments against the strength of the evidence against the defendant."  *Id.* (citations omitted).  "Prosecutorial misconduct does not warrant a new trial if it was harmless error."  *United States v. Harlow*, 444 F.3d 1255, 1265 (10th Cir. 2006) (citing *United States v. Alexander*, 849 F.2d 1293, 1296 (10th Cir. 1988)).  The court considers the Tenth Circuit's two-step analysis, below.

### a. Step One:  Propriety of the Prosecutor's Comments

Fed. R. Crim. P. 29.1 controls the order of closing argument.  It provides that "(a) the government argues; (b) the defense argues; and (c) the government rebuts."  Fed. R. Crim. P. 29.1.  The Advisory Notes to the Rule explain that "fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply."  Fed. R. Crim. P. 29.1 advisory committee's note to 1974 amendment.  Defendant contends that

the prosecutor's argument here deprived her of a fair trial because the prosecutor raised the aiding and abetting theory for the first time on rebuttal.

"'As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel.'" *United States v. Taylor*, 728 F.2d 930, 936 (7th Cir. 1984) (quoting *Moore v. United States*, 344 F.2d 558, 560 (D.C. Cir. 1965) (further citations omitted)).  Prosecutors are "restricted to responding to the points made by the defense counsel in closing argument." *Id.* at 937; *see also United States v. Wood*, 175 F.3d 1018 (Table), 1999 WL 172775, at *8 (4th Cir. Mar. 30, 1999) ("Proper rebuttal must respond with some degree of specificity to the arguments made by the defense.")

In *Taylor*, for example, the prosecutor commented on rebuttal about "particular points" of one witness's testimony that defense counsel had not discussed in closing argument.  728 F.2d at 937.  And the prosecutor commented on another witness's testimony that defense counsel had not addressed at all in closing argument.  *Id.*  Although *Taylor* concluded the comments were harmless based on the weight of the evidence, the prosecutor's comments still "were improper and constituted error." *Id.*

The Fourth Circuit reached a similar conclusion in *Wood*, 1999 WL 172775, at *8. There, the prosecutor's rebuttal introduced "two summary charts representing records of telephone calls" among members of a drug conspiracy. *Id.* at *1.  Defendant objected on the grounds that they were (1) inaccurate and (2) raised for the first time on rebuttal. *Id.*  The trial court overruled the objections. *Id.*  The Fourth Circuit, however, concluded that the trial court "erred by permitting the Government to argue the telephone evidence represented in the charts for the first time on rebuttal." *Id.* at *8.  The Circuit explained that the phone record evidence

"did not speak directly or specifically to [defendant's] argument in any way; it was merely additional evidence tending to suggest his guilt." *Id.* And, it was apparent that the government viewed the telephone evidence and summary charts as "strongly persuasive, and that it was saving them for rebuttal so that it could present these powerful elements of its argument to the jury as the last word on the evidence." *Id.* "'Fair response,'" the Fourth Circuit noted, "cannot be construed so broadly as to allow the Government to simply end-run Rule 29.1 . . . ." *Id.* Still, the Fourth Circuit held that the error didn't warrant reversal for two reasons: (1) defense counsel, anticipating the government's use of the charts on rebuttal, had argued in closing argument that the charts were inaccurate, and (2) the trial court instructed the jury that the charts were not evidence, minimizing the danger that the jury would "overemphasize" their value. *Id.*

As these cases show, not every Rule 29.1 violation will warrant reversal. But violations of this rule are not taken lightly. In *United States v. Maloney*, 755 F.3d 1044, 1045 (9th Cir. 2014) (en banc), the only contested issue at trial was whether the defendant knew he possessed drugs when officers apprehended him at a Border Patrol checkpoint. *Id.* at 1045. Although there was no evidence whether defendant had luggage with him when he was arrested, the prosecutor argued for the first time—on rebuttal—that the defendant must have lied to officers about details of his trip because he had no luggage with him. *Id.* at 1045–46. The rebuttal argument also asserted that the jury could infer defendant knew he possessed a controlled substance from the fact that he supposedly had lied to officers. *Id.* A divided panel of the Ninth Circuit affirmed the conviction. *Id.* The Circuit then considered the case en banc. *Id.* After oral argument, the United States Attorney for the Southern District of California moved to reverse the conviction. *Id.* After watching a video of the en banc oral argument and reconsidering the prosecutor's closing argument, the United States Attorney conceded that the prosecutor should not have made

the "luggage argument" on rebuttal.  *Id.* at 1046 n.2.  Her motion noted that the United States

Attorney's Office planned to use the video "as a training tool to reinforce the principle that all

Assistant U.S. Attorneys must be aware of the rules pertaining to closing argument and must

make every effort to stay well within these rules."  *Id.* (internal quotation marks omitted).  The

Ninth Circuit commended the United States Attorney for her concession and reversed the

conviction, noting that "'[t]he prosecutor's job isn't just to win, but to win fairly, staying well

within the rules.'"  *Id.* (quoting *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993)).

Here, the prosecutor's "aiding and abetting" rebuttal argument strayed outside the

limits imposed by Rule 29.1.  Defense counsel never addressed the "aiding and abetting" theory

in her closing argument.  And understandably so, because the prosecutor never referenced that

theory in the first phase of his closing argument.  Then, on rebuttal, the prosecutor raised "aiding

and abetting" for the first time.  Indeed, the government's brief never asserts the prosecutor's

comments were proper.  Because the government is restricted on rebuttal "to answering the

arguments put forth by defense counsel," the prosecutor's "aiding and abetting" argument on

rebuttal violated Rule 29.1.  *Taylor*, 728 F.2d at 936 (citation and internal quotation marks

omitted); *see also Wood*, 1999 WL 172775, at *8 (explaining that government may not "end-

run" Rule 29.1 by saving arguments for rebuttal).  Because defendant has carried her burden on

the first step of the analysis, the court now turns to step two.

### b.  Step Two:  Effect on Jury's Verdict

"When a court determines or assumes the prosecutor made an improper comment, it then

assesses whether the comment affected the jury's verdict."  *Christy*, 916 F.3d at 825 (citation

omitted).  "[A] prosecutor's improper statements alone will not require a new trial."  *Id.* (citing

*United States v. Sorensen*, 801 F.3d 1217, 1242–43 (10th Cir. 2015)).  But a new trial is

warranted when improper statements prejudiced the defendant. *Id.*; *see also United States v. McBride*, 656 F. App'x 416, 425 (10th Cir. 2016) (explaining that a new trial is warranted if prosecutorial misconduct deprives the defendant of a fair trial). And improper comments on rebuttal heighten the risk of prejudice. *See United States v. Meadows*, 867 F.3d 1305, 1321 (D.C. Cir. 2017) (Rogers, J., concurring) ("[W]hen . . . the rebuttal closing argument launches into new terrain and the sandbagging of the defendant is evident, a court must evaluate the likely prejudice to a defendant with considerable care."); *United States v. Ayala-Garcia*, 574 F.3d 5, 20 (1st Cir. 2009) (noting that "the rebuttal context increased the likelihood of prejudice because the improper remarks were among the last words spoken to the jury by the trial attorneys" (citations and internal quotation marks omitted)).

Defendant asserts she was prejudiced because she never had an opportunity to respond to the "aiding and abetting" argument the government raised on rebuttal. Doc. 163 at 7. Then, she asserts, the court erred when it provided the jury a supplemental instruction defining "aiding and abetting" in response to a question the jury submitted to the court during deliberations. *Id.* The cumulative effect of these and other errors deprived her of a fair trial, she asserts. *Id.* at 8. The government's Response never explicitly responds to defendant's prejudice argument. But, the government contends, "overwhelming evidence" shows defendant aided and abetted her coconspirators by helping them secure customers. Doc. 166 at 9.

After closely reviewing the trial record, the court agrees with defendant. As explained in step one, above, the government improperly raised an "aiding and abetting" theory of liability for the first time on rebuttal. In some circumstances, this comment might not warrant a new trial. "A prosecutor's improper statement to the jury is harmless unless 'there is reason to believe that it influenced the jury's verdict.'" *United States v. Ramirez*, 63 F.3d 937, 944 (10th Cir. 1995)

(quoting *Alexander*, 849 F.2d at 1296).  In this instance, though, there is no room to doubt that

the improper "aiding and abetting" comment influenced the verdict.  The jury submitted a

question expressing confusion precisely about this issue:  "Does it matter—what is the definition

of 'aiding and abetting to devise a scheme to defraud[?]'"  Doc. 154 at 1 (Jury Question No. 2).

    The court agrees with defendant:  the court should have acted to remedy the prosecutor's

improper rebuttal argument by permitting defense counsel supplemental argument or eliminating

the "aiding and abetting" language in the Jury Instructions.  Curative action might have mitigated

any prejudice, obviating the need for a new trial.  *See, e.g.*, *Whittenburg v. Werner Enters. Inc.*,

561 F.3d 1122, 1131 (10th Cir. 2009) (reversing conviction and remanding for new trial because

trial court "declined to take any specific curative action" in response to improper closing

argument); *Harlow*, 444 F.3d at 1266 (holding that despite prosecutor's improper statements,

trial court did not abuse discretion by denying motion for new trial because it gave a "clear and

thorough curative instruction" immediately after the closing argument that "sufficiently

disabused the jury of any misimpression" the improper statements caused).  But here, the court

overruled defendant's objection, denied counsel supplemental argument, and gave the jury an

instruction defining "aiding and abetting."

    Besides the lack of curative action, two other reasons persuade the court that defendant

was prejudiced by the improper argument.[7]  First, the prosecutor's comments on rebuttal "were

not 'minor aberrations' made in passing."  *Whittenburg*, 561 F.3d at 1131.  The Tenth Circuit has

---

[7]     *Whittenburg* discussed three factors "long used to mark the boundaries between when a new trial
is and is not required" because of improper argument.  561 F.3d at 1131–32.  These three factors are (1)
whether the improper comment merely was a stray remark, or whether it was repeated and emphasized,
(2) whether the district court took curative action, and (3) the apportionment of liability and the size of the
damage award.  The third factor doesn't apply in a criminal case, so the first two factors guide the court's
analysis. And, consistent with Tenth Circuit caselaw, the court also considers the weight of the evidence
against defendant.  *Christy*, 916 F.3d at 824.

held that "a stray improper remark in closing is no basis for upsetting a trial and requiring the parties and district court to redo their ordeal." *Id.*; *see also McBride*, 656 F. App'x at 424 (concluding that "spontaneous, off-the-cuff remark" on rebuttal didn't warrant conviction's reversal); *United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009) (concluding no prejudice resulted from prosecutor's "singular and isolated" remark in closing). In this trial, the prosecutor's "aiding and abetting" argument was "emphasized" explicitly. 561 F.3d at 1131. The prosecutor argued that the new theory was "key" to defendant's conviction:

> The defendant is charged with conspiracy to commit mail and wire fraud. In Section 2 is the aiding and abetting statute. What's key about this is that if you don't believe that she did what she did on her own, she assisted, she aided and abetted others to do those things of which she's charged too as well. So take a look at that. I think that's key.

Doc. 185 at 73 (Trial Tr. 1801:15–20). The prosecutor also projected a copy of Jury Instruction No. 12—the conspiracy instruction—for the jury to view, where he had drawn brackets around "aiding and abetting" and drawn a line to the margin of the page. Doc. 163-2. In the margin, he had handwritten "Section 2!" *Id.* This "key" theory—accompanied by a visual recognition of the importance of "aiding and abetting"—was far more than a "'minor aberration[ ]' made in passing" or a "stray remark." *Whittenburg*, 561 F.3d at 1131; *McBride*, 656 F. App'x at 424. Instead, it was an argument that introduced a new theory of liability. And, this theory was the final word the jury heard from the parties.

Second, the evidence against defendant on the conspiracy charge was thin. As explained in Part II.B.2. (Conspiracy to Commit Mail and Wire Fraud), whether the government presented sufficient evidence to sustain her convictions presented a relatively close question. The court sustained the conspiracy charge because the evidence showed that defendant's coconspirators had advised customers to withhold mortgage payments from their lenders. Two customers—

Bruce S. and Tammy A.—testified that they followed this advice and each skipped three mortgage payments. From this evidence, a rational jury could have inferred that a financial institution faced a risk of loss because of defendant's fraudulent scheme. But the evidence hardly was overwhelming.

The court's analysis thus far has focused on Count 1's conspiracy charge. But Counts 8 and 9's wire fraud charges also charged aiding and abetting under § 2. Doc. 153 at 23 (Instruction No. 16) ("The defendant is charged in . . . Counts 8 and 9 with violations of 18 United States Code § 1343 and 2; that is, Wire Fraud). So, the court also must decide whether the improper "aiding and abetting" comments warrant a new trial on Counts 8 and 9. *See Whittenburg*, 561 F.3d at 1128 (explaining that appellate court's role "is to police the outer boundaries of permissible argument," while trial court exercises discretion in assessing need for new trial because trial judge "is uniquely positioned to assess the prejudicial effect of an improper argument in the context of the overall trial").

Exercising its discretion, the court concludes the improper comments unfairly prejudiced defendant's trial, including the jury's verdict on Counts 8 and 9. The prosecutor's improper "aiding and abetting" argument on rebuttal was the final word the jury heard from the parties. This timing increases prejudice to defendant's right to a fair trial. *See United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005) ("The potential for prejudice is great during closing arguments, especially when the defense has no opportunity for rebuttal."). And, the prosecutor emphasized that § 2 was "key" to the jury's verdict. *See* Doc. 185 at 73 (Trial Tr. 1801:15–20) ("What's key about this is that if you don't believe that she did what she did on her own, she assisted, she aided and abetted others to do those things of which she's charged too as well. So take a look at that. I think that's key."). This emphasis on the improper argument also increases

the defendant's prejudice.  *See King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 591 (10th Cir. 2007) (explaining that court will find requisite prejudice and order new trial "where counsel truly overemphasizes an improper argument").  Finally, although the jury asked a question about "aiding and abetting" in the context of the conspiracy charge, the court cannot conclude it applied the supplemental "aiding and abetting" instruction solely to Instruction No. 12 (the conspiracy instruction).  The jury may have applied the supplemental "aiding and abetting" instruction to the mail and wire fraud charges because they, too, charged violations under § 2. *See Morgan v. Baker Hughes Inc.*, 947 F.3d 1251, 1260 (10th Cir. 2020) (noting that the court presumes the jury follows the court's instructions).

The court is mindful that defendant isn't entitled to a perfect trial.  She is, however, entitled to a fair one.  *United States v. Brooks*, 727 F.3d 1291, 1307 (10th Cir. 2013).  Beginning with the government's rebuttal, her trial meaningfully departed from the standard for a fair trial. The government raised a new argument on rebuttal, violating Fed. R. Crim. P. 29.1.  And the improper comments raised a new, important theory of liability, that wasn't a "'minor aberration[ ]' made in passing."  *Whittenburg*, 561 F.3d at 1131.  While a contemporaneous objection might have mitigated the damage, defendant didn't object until the jury expressed confusion about "aiding and abetting" in a question.  The court concludes it should have taken curative action, but it didn't.  And considering the evidence against defendant already was limited, the court cannot conclude that these errors were harmless.

In sum, the prosecutor's improper argument on rebuttal—compounded by the court failing to strike the aiding and abetting language or permitting defendant supplemental argument—deprived defendant of a fair trial.  The jury's question "Does it matter—what is the definition of 'aiding and abetting to devise a scheme to defraud[?]'" (Doc. 154 at 1)—provides

sufficient reason to believe the improper argument affected the jury's verdict. And the timing and nature of the comments were prejudicial enough to have affected the jury's verdict on all counts. *See United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001) (concluding prosecutor's improper comments "infected the entire trial" because, among other reasons, they were made on rebuttal, which left a "lasting impression that certainly remained with the jury after the prosecutor's rebuttal argument"). The court thus grants defendant's Motion for New Trial (Doc. 163).

## IV.    Conclusion

First, the court grants in part defendant's Motion for Judgment of Acquittal (Doc. 142) and denies it in part. The court grants the motion on Counts 2-6 because the government failed to prove defendant's mail fraud and wire fraud "affect[ed] a financial institution." 18 U.S.C. § 3293(2). Because the government failed to prove this essential element, it could not invoke § 3293(2)'s 10-year statute of limitations. Without the extended statute of limitations, it secured the Indictment untimely and the convictions on those charges cannot stand. The court denies the motion on Count 1 and Counts 8 and 9, however, because the government presented sufficient evidence for a rational trier of fact to infer that defendant's scheme affected a financial institution, thus triggering the 10-year limitations period.

Second, the court grants defendant's Motion for New Trial (Doc. 163) as it applies to Counts 1, 8, and 9. The prosecutor improperly raised a new theory of "aiding and abetting" liability on rebuttal. And the court failed to take curative action. Instead, it submitted a supplemental "aiding and abetting" instruction after the jury expressed confusion about this theory. This combination of errors unfairly prejudiced defendant and deprived her of a fair trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Judgment of Acquittal (Doc. 142) is granted in part and denied in part.  The court grants defendant's motion for acquittal on Counts 2-6 and directs the Clerk of the Court to enter a judgment of not guilty on Counts 2, 3, 4, 5, and 6.  The court denies defendant's motion on Count 1 and Counts 8 and 9.

**IT IS FURTHER ORDERED THAT** defendant's Motion for New Trial (Doc. 163) is granted.  Defendant deserves a new trial on the charges in Counts 1, 8, and 9.  The court also sets the case for a status conference on July 30, 2020 at 9:00 AM to discuss defendant's rights under the Speedy Trial Act and a trial setting.  The parties must come to that status conference prepared to discuss the deadline under the Act for that trial to commence.

**IT IS SO ORDERED.**

**Dated this 22nd day of July, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
